PROVOSTY, .J.
Plaintiff claims that defendant employed him to help in disposing by sale of his property, and that, after the services had been rendered and a sale made, defendant refused to 'pay him the price agreed upon.
Defendant was a timber man of 30 years’ experience in the timber business, and was owner of several thousand acres of timber lands, and also of the timber on several other thousands of acres in Calcasieu and Vernon parishes and the adjoining counties of Texas. For converting this timber into lumber, he determined to establish a sawmill plant at Merryville, in the parish of Calcasieu, about 18 miles from where he lived. In May, 1906, while the mill was under construction, a Mr. Carroll, of Beaumont, Tex., came to Merryville with a view to buying defendant’s land and timber holdings, and took occasion to examine the property and inform himself as to its value. The record does not show whether defendant was then already desirous of selling. At any rate, no sale was then made; but, instead, a corporation was organized, with a capital stock of $100,000, for taking over the sawmill plant and operating it. The name of this corporation was C. L. Smith Lumber Company. The defendant, C. L. Smith, took $51,-000 of its capital stock. A Mr. Durham, who figures as a witness, and in a sense as a coplaintiff, in the present case, took $8,000. Mr. Carroll and a Mr. Keith, of Beaumont, Tex., took some of the stock, how much, the record does not show; and among the other stockholders was a Mr. Britt Nicholls, who figures as one of the witnesses in the case. The defendant Smith was president of the company for a while; but was soon succeed-, ed by Mr. Carroll, who was also the general manager. The output of the mill was marketed through the Beaumont Lumber Company, of Beaumont, Tex., in which both Mr. Carroll and Mr. Keith were stockholders. We mention, in passing, and simply because counsel for plaintiff lay stress upon it, as if significant, that the defendant suspected that the Beaumont Lumber Company was not giving the C. L. Smith Lumber Company a fair deal in disposing of the lumber. W. A. Moore, one of the witnesses in the case, was in charge of the office of the C. L. Smith Lumber Company. Defendant’s holdings in land and timber were not transferred to the company; but a contract was made with the company for their exploitation. The sawmill plant was located on defendant’s land.
In May, 1907, defendant was desirous of selling his land and timber holdings as well as his stock in the C. L. Smith Lumber Company. His chief reason seems to have been that he had, or soon would have, to meet payments for which he was unprepared. For making this sale he solicited the aid of plaintiff, who was a merchant and banker in Leesville, parish of Vernon, and had had large experience in manipulating transactions of that kind; and with whom he was friendly, they having been at one time brothers-in-law, from having married sisters. Whether defendant sought out plaintiff at his home in Leesville, or requested him to come to Merryville, is not clear, but is immaterial. Plaintiff did go to Merryville, and did, in collaboration with Mr. Durham, render services in making a complete list and valuation of the plant and properties. Plaintiff rendered services also in interesting in the proposed sale the Nona Mills Company, a large lumber concern having establishment at Lees-ville, La., and Beaumont, Tex. Soon thereafter the parties met in Beaumont for a *237 conference. The proposition was to sell the entire property — sawmill plant and all. The would-be purchasers offered $500,000. Defendant for himself and his associates in the C. L. Smith Lumber Company asked $705,-000. When the parties saw themselves so hopelessly apart, they laughed, and broke up negotiations. Defendant, then, at once, opened negotiations with Messieurs Carroll and Keith, his fellow stockholders in the C. L. Smith Lumber Company, proposing to sell them his stock in the company and all his land and timber holdings for $420,000. This proposition after some two months of negotiations, was accepted; and a sale was made, the final draft of the contract being dated Beaumont, July IS, 1907. The plaintiff had made known to a Mr. Bear, representing New Orleans and Chicago dealers in timber and timber lands, the fact of defendant’s having these timber holdings for sale; and Mr. Bear, pending the negotiations with Messrs. Carroll and Keith, became anxious to enter into negotiations with defendant. He figures as one of the witnesses in the case.
The defendant does not deny having agreed to give $6,000 to plaintiff, to be divided between him and Mr. Durham, in the proportion of $5,000 to plaintiff and $1,000 to Durham; but testifies that the agreement was distinctly for effecting a sale to the Mona Mills Company for $750,000, and that, when the transaction with that company fell through, the connection of plaintiff with his business terminated. Defendant, though a garrulous witness and an uneducated man, is very definite in his statements, and creates the impression of testifying to things of which he has a clear notion and distinct recollection.
Plaintiff, on the other hand, throughout is very vague, and deals mostly in generalities. To begin with, the first suit he brought had to be withdrawn in order that the facts relied upon by him, or, in other words, his cause of action might be more correctly stated. True, Mr. Monk, one of his attorneys, explains that the error in the first petition was his own, and not plaintiff’s; but the suit was brought only after full conference with plaintiff, and, if plaintiff had been more definite and precise, the error would not likely have occurred. For proving his demand for $6,000, based on an alleged oral contract for services, the following was his testimony in chief:
“Q. There was a contract between you and Mr. Smith by which he was to pay a stipulated sum for his services? A. Yes, sir. Q. What was the money he was to pay you? A. Six thousand dollars, and my ■ expenses. Q. For what? A. For working for him as his ad-visor in the sale of his mill and timber holdings. Q. Do you mean his mill' or stock in the O. L. Smith Lumber Company? A. I mean all of it, stock and holdings both. Q. What I am getting at, Mr. Powefi, did C. L. Smith at that time own the entire mill or own the stock? A. He owned both.”
He was then questioned regarding the services he claimed to have rendered, and his answers were characterized by the same generality. The only thing specific as to time and place, when and where, the contract was entered into, is the statement that Mr. Smith “first addressed him on the proposition in his store in Leesville.” On cross-examination he was more definite. He said that it was distinctly understood between him and Mr. Smith that he was to have $6,000, no matter at what price Mr. Smith should sell the property; and that no particular amount was fixed as the price to be obtained for the property, but that it was to be whatever price Mr. Smith should eventually consent to accept. In his redirect examination he said that defendant had come to Leesville to solicit his services, and had expressed a willingness to pay him $10,-000 for his services.
“I said at first I could not do it, that I was under obligations to work for Mr. Sanders, and 1 could not lose the time, ‘but,’ I says, ‘that’s *239 a whole lot of money to turn down’; and he says, T do absolutely know that, if you will get busy with Mr. Durham and help to sell this mill, I will give you $10,000.’ Q. Yon went to Merryville? A. Mr. Smith says: ‘If you will go ahead with the proposition, I will pay the expenses, the hotel bills, railroad fare, and give you $6,000 for your services, and, if you will work with me and help me to figure out values of timber, values of sawmill, values of commissary, and work with the other fellow and get a good price, and I am satisfied with the price, I will pay you $6,000.’ ”
On being recalled in rebuttal, he testified, as follows:
“As Mr. Smith stated yesterday, just the fact that we did not close our negotiations so far as my salary was concerned until we got to the depot at Merryville, and I had to go home, and Mr. Durham was going to the depot and was going by Mr. Smith and I were walking along together to the depot, and he was telling me about all that would have to be done, how much Mr. Durham knew about the timber and the capacity of the mill; in fact, especially that he was well acquainted with all the details of his interest in the O. L. Smith Lumber Company. Q. What else? A. He says: ‘On account of that and being anxious to make this deal, and to be sure that he would have enough help to take up all the details in an intelligent way, I want you to agree to give Mr. Durham $1,000 out of this $6,000. I think you ought to do that because we are all friends, and we all can work together harmoniously, and you understand Mr. Durham, and you know how his competency is, and I want you to agree to do that.’ He says: T will pay you the $6,000 that I agreed to, but I want you to pay Mr. Durham $1,000 of this money.’ And I agreed to do it, and this is the contract as I understand, and this is how it came about.”
Elsewhere in his testimony plaintiff says:
“Well, I was not only trying to sell the plant in Mr. Smith’s interest in the C. L. Smith Lumber Company, as I first stated, but I was helping him in an advisory way, financing the business.”
There is an apparent contradiction in defendant’s statements as a witness with regard to the place where his agreement with the plaintiff was entered into. He first said that it was in the office of the sawmill company at Merryville, and later that it was at the railroad depot. This apparent contradiction is explained by the above transcribed testimony of plaintiff to the effect that they did not “close” their agreement until they were on their way to the depot, implying that the terms of it had been previously discussed.
As to what these terms were, as discussed in the office, defendant is corroborated by Mr. Nicholls, one of the stockholders of the company, who says that he was called to the office, and asked what commission he was willing to pay for the sale of his stock, and that he had answered that he would do just as had been agreed upon; that is to say, would pay $500 if they should dispose of his stock at two to one, and that “Mr. Powell claimed that he could sell the proposal in 15 days. Mr. Smith says: ‘That’s a little too early. I will give you 30 days, and, if you will sell the proposition for $750,-000, I will give you $6,000 to perfect the sale.’ ” And that this price was “for the entire outfit, land, timber, locomotive engines, railroad, live stock, cars, vehicles, and the stock of the company.”
Mr. W. A. Moore, the employé of the C. L. Smith Lumber Company in charge of the office, heard conversations in the office, in which the defendant fixed a price of $750,-000 for the property as an entirety.
Plaintiff’s ease does not recommend itself. It would seem so unbusinesslike that the defendant should have bound himself to give $6,000 whenever he should sell his property, no matter, when, to whom, and at what price; and so bound himself simply in consideration of plaintiff’s promise to help in effecting a sale, with no specification of what the services should consist in. And, in like manner, it would seem so unbusinesslike that the plaintiff should have entered into a serious and important contract for the sale of property without fixing a price for the sale.
On the other hand, defendant’s story is plausibility itself. He says that for negotiating a sale with his own associates in busi *241 ness he had no need of plaintiff’s assistance, and that he so informed plaintiff. In that statement he is to some extent corroborated by Mr. Carroll, to whom the sale was made, who says:
“Mr. Powell came in my office with Mr. Smith and Mr. Durham, and I did not know whether or not he was Mr. Smith’s agent. He stated when he came in that he didn’t have anything to do with the deal, but, as he was pretty good at figures, Mr. Smith had invited him to come down so that he might be able to help out in some of the figures.”
Even Mr. Durham’s testimony furnishes some corroboration. He said:
“While we were in Beaumont, Mr. Smith became dissatisfied with what Mr. Powell was doing in his behalf, and asked me to tell Powell that he did not want him to have anything more to do or say in the trade.”
That defendant should be willing to give plaintiff $6,000 for negotiating a sale of the entire concern to the Nona Mills Company for $750,000 is entirely plausible; but where is the plausibility of his having been willing to allow plaintiff that same amount for negotiating a sale at $420,000 to Messieurs Carroll and Keith, stockholders in the C. L. Smith Lumber Company, his associates in the business, as well informed as he regarding the property and its value?
In proving up his services, plaintiff, among other things, says that he was working all the time with Carroll and Keith to get the price of $420,000; that it was he who “submitted the proposition to” Mr. Carroll, and that he went to the office of Mr. Carroll several times on this deal; and that “Mr. Carroll stated that he was glad I was interested in this proposition, for he and Mr. Smith could not get along”; that he had “many conferences with Mr. Smith and the purchasers of this property pending the negotiations.”
Now, Mr. Carroll testified as follows:'
“Q. State whether or not the plaintiff in this case, William H. Powell, ever acted in the matter of the said transaction either as the broker, or as the agent of the said Charles L. Smith. A. Mr. Powell came in my office with Mr. Smith and Mr. Durham. I did not know whether or not he was Mr. Smith’s agent. He stated when he came in that he did not have anything to do with the deal, but, as he was pretty good at figures, Mr. Smith had invited him to come down so that he might be able to help out some in the figures. That is my recollection. Q. State whether or not the plaintiff W. H. Powell, brought you and your associates together with the said C. L. Smith with a view of effecting a sale of the said stock and of the said pine timber and timbered land. A. He did not. Q. State whether or not the said W. H. Powell ever submitted to you or your associates any proposition for or in behalf of the said C. L. Smith looking to the sale of the said stock and property. A. No; he did not. Q. State whether the said W. H. Powell ever came to you or your associates for or in behalf of the said C. L. Smith? A. No; not that I remember of.”
The witness further testified that the proposition of sale was made by Smith himself, and that the sale was the result of Smith’s own negotiations with him and his associates.
Mr. Keith testified to the same effect, namely, that the sale was the result of Smith’s own direct negotiations, and that witness never knew of Powell’s acting as agent or broker for Smith, and that Powell never submitted any proposition, and that he met Powell only once in the office of Mr. Carroll.
Mr. Carroll and Mr. Keith could not be mistaken in the positive statements here made by them touching what part plaintiff took in the negotiations by which the sale in question was consummated. N'or could plaintiff’s equally positive statement to the contrary have been made in error. The consequence is that plaintiff is entirely discredited as a witness.
True, plaintiff is corroborated by the witnesses Sanders, Durham, and Bear; but Sanders is discredited, Durham is an interested witness, and Bear was testifying, after four years, to conversations he had overheard in a hotel lobby touching matters in which he was not personally interested, and, *243 while he was willing to be positive that the statements made by defendant of his agreement to pay $6,000 to plaintiff had reference to the sale to Oarroll and Keith, it is quite possible that the agreement defendant spoke of in the conversation in question had reference to the sale to the Nona Mills Company. Durham is an interested witness because he is to get $1,000 of the $6,000 in case plaintiff succeeds. Sanders is discredited because he testified positively that he was not one of the purchasers, whereas it is conclusively shown that he was, in fact, the largest contributor of cash in the transaction, and he so testified advisedly, and not through any inadvertence or mistake, for one of the defenses to a suit brought by him against defendant for a commission of $2,500 for alleged services in connection with this same sale turned upon that point.
Sanders’ testimony is further weakened, if such a thing be possible, by the circumtance that, while he is Powell’s witness in Powell’s suit for a commission, Powell is his witness in this suit for a commission.
Of Mr. Durham we will say that we believe that he is simply mistaken; that, like Mr. Bear, he is applying to the deal with Oarroll and Keith statements made by defendant with reference to the deal with the Nona Mills Company. Oral admissions, or reports of conversations, are unreliable evidence at best, and become more and more so with the lapse of years.
The plaintiff undoubtedly rendered services. With a view to getting the proposition in proper shape for presentation to the prospective purchasers, the Nona Mills Company, he and Mr. Durham made a complete listing and valuation of the properties; and these services were undoubtedly valuable, and inured to the benefit of defendant in his negotiations with Messrs. Oarroll and Keith. But defendant testifies, and the evidence, as a whole, compels the belief, that the services were rendered in connection with the deal with the Nona Mills Company.
Our impression of the matter is that after having rendered these services, which would thus inure’ to defendant’s benefit in the negotiations which he had opened up with Carroll and Keith, plaintiff was reluctant to sever his connection altogether with the sale of defendant’s property, and lose the opportunity of making a commission, and that he hung to the business as far as circumstances would allow, in the'hope that, generosity or a sense of justice would prompt defendant to make some substantia] acknowledgement, and that defendant disappointed him in that regard, and that this suit followed.
When, in the course of the negotiations, defendant felt the need of advising with some one, it was from a Mr. Newman he sought counsel; and for such counsel he paid Mr. Newman. Why, if plaintiff had been his retained advisor at a high salary, defendant would have thus had recourse to Newman, it would be hard to explain.
The judgment appealed from is set aside, and the suit is dismissed, at plaintiff’s cost.